NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2694-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ALBERTO LOPEZ, a/k/a
ALBERTO LOPEZ, III,
ALBERTO A. LOPEZ,
ALBERTO C. LOPEZ,
and CHOPPY,

      Defendant-Appellant.

_____

Argued February 15, 2022 – Decided July 15, 2022

Before Judges Sabatino, Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law
Division, Mercer County, Indictment No. 15-01-0014.

Douglas R. Helman, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; Douglas R. Helman, of
counsel and on the brief).

Taylor S. Hicks, Assistant Prosecutor, argued the cause
for respondent (Angelo J. Onofri, Mercer County
Prosecutor, attorney; Taylor S. Hicks, of counsel and
on the brief).

The opinion of the court was delivered by

NATALI, J.A.D.

After he was waived to the Law Division to be tried as an adult, a jury convicted defendant Alberto Lopez of murder, felony murder, and robbery – three first-degree offenses – along with two second-degree weapons charges. The jury's verdict was based, in part, on the testimony of an eyewitness who saw defendant shoot the victim in the head during a drug transaction, a murder he committed when he was sixteen years old.

After merger, the court sentenced defendant to an aggregate forty-two-year custodial term, subject to an 85% period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a concurrent five-year term with respect to one of the weapons offenses. Before us, defendant raises the following arguments:

> I. THE RULING THAT [DEFENDANT]'S STATEMENT, ELICITED IN VIOLATION OF HIS SIXTH AMENDMENT AND STATUTORY RIGHTS TO COUNSEL, WAS ADMISSIBLE TO IMPEACH HIM, IMPERMISSIBLY IMPINGNED UPON [HIS] RIGHT TO TESTIFY IN HIS OWN DEFENSE. REVERSAL IS REQUIRED.
>
> II. THE COMPLETE LACK OF ANY JURY CHARGE ON IDENTIFICATION – WHEN THE STATE'S ENTIRE CASE HINGED UPON THE EYEWITNESS TESTIMONY OF ONE INDIVIDUAL– DEPRIVED [DEFENDANT] OF A FAIR TRIAL, REQUIRING REVERSAL.

A. A Jury Instruction on the State's Burden to Prove Identity was Required.

B. The Court Also Failed to Give the Required Instruction on the Reliability of Eyewitness Identifications.

III. THE JUDGE LEFT OUT A CRITICAL PORTION OF THE ROBBERY CHARGE CONCERNING INTENT AND THE USE OF FORCE, REQUIRING REVERSAL, BUT IN ANY EVENT, THERE WAS INSUFFICIENT EVIDENCE OF THE INTENT ELEMENT FOR ROBBERY. THE MOTION FOR ACQUITTAL ON COUNTS II AND III SHOULD HAVE BEEN GRANTED.

IV. DETECTIVE MCNALLY'S INVOCATION OF A NON[-]TESTIFYING WITNESS, AND HIS TESTIMONY ON THE QUALITY OF THE STATE'S EVIDENCE AND THE CREDIBILITY OF THE STATE'S WITNESSES, VIOLATED [DEFENDANT]'S RIGHTS TO CONFRONTATION, THE HEARSAY RULES, AND CONSTITUTED IMPROPER LAY OPINION IN VIOLATION OF N.J.R.E. 701 and 702. THIS IMPROPER TESTIMONY WAS COMPOUNDED IN THE PROSECUTOR'S CLOSING STATEMENT. REVERSAL IS REQUIRED.

V. THE CUMULATIVE IMPACT OF THESE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.

VI. [DEFENDANT]'S 42-YEAR SENTENCE VIOLATED THE PRINCIPLES OF MILLER V. ALABAMA AND IS ALSO INDEPENDENTLY EXCESSIVE.

A-2694-18

3

After considering the record against the applicable standards of review and legal principles, we affirm defendant's convictions and sentence.

I.

We discern the following facts from the evidence adduced at trial. On December 18, 2013, two Trenton police officers responded to a "man down" and "shots fired" report at a location near the police department. Upon arriving at the scene, the police immediately noticed the victim, Shamere Melvin, on the ground with a fatal gunshot wound to his head. They also observed a single bullet shell casing near his body.

Melvin was pronounced dead at the scene. Later that night, a police officer contacted Detective Robert McNally of the Mercer County Prosecutor's Office and advised him that Alyssa Simmons, a juvenile, arrived at the police station and stated she had information regarding the Melvin homicide. Detectives McNally and Anthony Abarno thereafter obtained statements from Simmons and her friend, Allyson Keil.

Based on those statements, and other evidence developed during the investigation, the detectives learned that at defendant's request, Keil reached out to multiple drug dealers to purchase one ounce of marijuana with the promise that he would share the marijuana with her. Keil discussed the potential drug deal with "around [ten]" people by telephone and text message. Keil also posted

A-2694-18

a Facebook message asking if any of her friends had marijuana for sale, to which Melvin responded and offered $700 for two ounces. Keil testified this was the highest price proposed with $100 per ounce the lowest offer. She also stated that she relayed information on each dealer to defendant by Facebook message and telephone, and defendant asked questions about where each dealer lived, their appearance, and age.

Keil then reached out to Simmons, who drove her and defendant to Trenton to purchase the drugs from Melvin. Simmons and Keil testified they drove with defendant, who Simmons knew as "Choppy" from middle school, and another individual who both girls assumed was defendant's cousin, known as "Mooch." Simmons stated Mooch wore a ski mask, a blue hoodie and blue jeans, and she could only see his eyes. Keil similarly testified that Mooch wore "a dark hoodie, dark pants . . . [and] had a mask on."

Simmons stated that once the group arrived to meet Melvin, Keil got out of the car and hugged him. Keil explained she spoke briefly and in a friendly manner with Melvin because she knew him from school, but defendant called her back to the car and told her "he did not want to do [the deal] anymore [because] there [were] too many people [around]." Simmons likewise stated that she remembered defendant and Mooch quickly returning to the car after

A-2694-18

Keil first got out because the area was too "suspicious," and there were too many people at the location.

Keil noted that while they were driving to a new location, defendant called Melvin and told him that he "didn't want to do [the deal] unless he was by himself." After driving a few blocks, defendant and Mooch saw Melvin, who was with a friend. Keil stated that she heard Melvin tell his friend to "go and stand by the corner" and at that point, defendant and Mooch got out of the car and walked toward Melvin "about a house length away" from the car.

While looking through the mirror as she was seated in the driver's seat, Simmons testified she saw defendant shoot Melvin. Although it was dark outside, she stated that there were "a lot of streetlights," and that she saw "a flash and [Melvin] drop[] to the ground." For her part, Keil testified she was seated in the backseat and heard a "pop," and turned around to see Melvin's "body on the floor" and defendant rummaging through his pockets. She stated that she then watched defendant, with a gun in his hand, take marijuana from Melvin's pockets while Mooch ran in the opposite direction.

In their initial statements, both Simmons and Keil acknowledged they were in the car with defendant, stopped so he could purchase marijuana from Melvin, and saw a flash and heard the "pop of a gun," but stated they could not be sure if it was defendant that pulled the trigger. Simmons and Keil, however,

gave later statements in which they identified defendant as the person who shot Melvin. At trial, Simmons testified that she was certain defendant was the person she saw shoot Melvin, and acknowledged she neglected to identify defendant in her earlier statement to detectives, but attributed that omission to being "scared" and not wanting "anything to happen to [her] family or [her]self."

As part of her later statement, Keil also informed detectives that she saw defendant rummage through Melvin's pockets and steal the marijuana. Keil testified that she did not tell detectives about the theft in her initial statement because she was sixteen "at the time, [she] was scared, and [she] was scared she was going to get charged, too."

Simmons stated that after the shooting she drove off "hysterical," and once she composed herself in a parking lot, drove to her friend Alyssa Parvesse's house. Because Parvesse was not home, Simmons and Keil drove to Simmons' house and waited for Parvesse to pick them up. After she arrived, Parvesse drove Keil home, and dropped Simmons at her aunt's house, where her mother was staying. Both Simmons and Keil informed their parents of what had occurred and then proceeded to the police station.

Parvesse testified at trial and stated that she declined Keil's request to drive her to Trenton to buy marijuana with defendant. Parvesse also explained that once Keil and Simmons arrived at her house, they told her that they saw

"Choppy" shoot Melvin. Parvesse told police that she had warned Simmons earlier in the evening about her suspicion that Keil and her friends were planning a robbery. Parvesse also testified as to Simmons' and Keil's emotional states, describing Simmons as "really scared and shaking and crying" and Keil behaving "like a shocked person."

Defendant was arrested and charged in the Family Part with first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). He was orally informed of his Miranda[1] rights with his parents present, and they signed a consent form for an interview. Despite being a minor and formally charged, the police obtained a separate signed waiver of defendant's Miranda rights and elicited a statement from him without counsel present.

In his recorded statement, defendant denied killing Melvin, and stated he only approached him to purchase marijuana. Defendant further insisted that his cousin was not with him that evening, and that he came by himself with Keil and Simmons. When he arrived, defendant stated that he got out of the car to meet Melvin, and saw an unknown individual with a black hoodie cross the street and walk towards them. Believing this individual was about to rob him,

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2694-18

defendant explained he began "backing up," and when he turned around and began to run, "all [he] heard was gun shots." Shocked and afraid, defendant said he fled the scene after Keil and Simmons left in the car.

The State moved for involuntary waiver of jurisdiction pursuant to N.J.S.A. 2A:4A-26 and Rule 5:22-2. The court granted the motion and waived defendant's case to the Law Division. In doing so, the court concluded the State established probable cause that defendant committed criminal homicide, one of the enumerated offenses under N.J.S.A. 2A:4A-26.1(c)(2), and more specifically, murder as defined by N.J.S.A. 2C:11-3.

Defendant was thereafter indicted by a grand jury on first-degree murder (count one); first-degree felony murder, N.J.S.A 2C:11-3(a)(3) (count two); first-degree robbery, N.J.S.A 2C:15-1 (count three); second-degree possession of a weapon for an unlawful purpose (count four); and second-degree unlawful possession of a weapon (count five).

Defendant filed a number of pretrial motions. As relevant to the issues before us, he moved to dismiss count two of the indictment and to amend count three from robbery to theft, relying primarily upon State v. Lopez, 187 N.J. 91, 101-02 (2006), claiming that because any theft occurred after the use of force, he did not possess the requisite intent sufficient to support the robbery count. The court denied defendant's motion and distinguished Lopez by concluding that

the State presented sufficient circumstantial evidence to establish defendant possessed "an intent to steal from Melvin . . . [that was] formed prior to or contemporaneous with his shooting."

Defendant also filed an application to suppress his statement to the police for all purposes, reasoning that it had been taken without counsel present, contrary to State in the Interest of P.M.P., 200 N.J. 166, 178 (2009) (holding that juveniles may not waive their Miranda rights without counsel present once a formal complaint has been lodged). The State conceded that defendant's statement was obtained contrary to his Sixth Amendment rights and therefore agreed that it could not use his statement its case-in-chief. The State argued, however, that based on State v. Burris, 145 N.J. 509, 533 (1996), defendant's statement was trustworthy and voluntary, and as such, it could still be used to impeach him should he testify.

The court rejected defendant's application and explained that although the statement was inadmissible in the State's case-in-chief, the State was permitted to use the statement for impeachment purposes, subject to a finding that the statement was voluntary and trustworthy, as well as any concerns regarding undue prejudice. The court distinguished P.M.P., 200 N.J. at 178, reasoning defendant had been waived to adult court, unlike the juvenile in that case. After defendant and his counsel conferred, his counsel "concede[d] that the statement

[defendant gave to Detectives McNally and Abarno] was voluntary," and as such, there was no need for a N.J.R.E. 104 hearing on the issue. The court confirmed that "in effect, if [defendant] decides to take the witness stand, he is acknowledging he can be cross-examined with that prior statement?" and defense counsel stated that was accurate.

At trial, Sergeant Brian Jones of the Trenton Police Department testified that he arrived at the scene to find a "man down on the sidewalk" and discovered that the victim had suffered a gunshot wound to the head. He also stated that he found only one "shell casing in close proximity to the victim," who he identified as Melvin. A second officer, Sergeant Paul Toth, explained that an inventory conducted as part of Melvin's autopsy revealed he had five one-dollar bills in his pocket and a wallet, but no marijuana.

Dr. Lauren Thoma, the Middlesex County Medical Examiner, also testified for the State, and stated that Melvin's cause of death was a single gunshot wound to the head. Because there was no evidence of gunshot residue, Dr. Thoma testified that the wound was a "distant wound," that likely occurred from "not less than several feet away," but it could be up to twenty or thirty feet away.

Finally, Detective McNally stated that he spoke with several people at the scene, who heard the gunshot from their homes. Detective McNally also

testified with respect to records obtained from Facebook in the course of the investigation. The detective explained that the police identified defendant's Facebook account, which was registered under the name "Chop Ice," but after obtaining a warrant to review records from that account, defendant did not have any "Facebook messages going back and forth with anybody." In contrast, Detective McNally indicated that Melvin's Facebook records for the same time period showed "in excess of 500 pages" of messages.

Detective McNally explained that he also obtained Facebook records for Keil for the same time period. When asked why the defendant's account did not reveal any messages, the detective explained that he believed the messages had been deleted because after speaking with Keil, who informed police she communicated with defendant via Facebook messenger, "the majority of all her messages that she had told [police] she had been communicating with were on her pages, but yet none of those messages were on [defendant's] pages."

On direct examination, Detective McNally also stated that he spoke with Jabree Green, Melvin's friend, but that Green told detectives he did not witness the murder and was not willing to give a formal statement. Green did tell Detective McNally, however, that he had been with Melvin earlier in the evening near the scene of the murder, when Melvin "walked off and said he'd be back in about [ten] or [fifteen] minutes," but when he heard a gunshot, Green ran up the

block and turned the corner to find Melvin lying on the ground. Detective McNally stated that he tried to speak with Green various times over the years, but Green was uncooperative, even though the police believed he had been a witness.

On cross-examination, defense counsel asked Detective McNally about his interview with Green. In response, Detective McNally again stated that Green told him "he did not witness [the murder] and was not present." Defense counsel also asked Detective McNally about the forensic evidence recovered. Detective McNally testified that law enforcement never recovered a gun, and there was no DNA or fingerprint evidence linking defendant to the murder.

At the close of the State's case, defendant made a motion for judgment of acquittal, arguing that there was insufficient evidence under State v. Reyes, 50 N.J. 454, 458-59 (1967), to support a conviction. The court denied the motion, concluding that based on the evidence introduced at trial, a reasonable jury could find that defendant purposely or knowingly shot Melvin, and could further infer that "defendant formed [the] intent to steal the marijuana even before he shot and killed [Melvin]."

The court charged the jury consistent with the parties' requests and in accordance with the Model Jury Charges (Criminal). The jury deliberated for

several days, and after requesting a playback of Simmons' testimony and parts of Keil's testimony, found defendant guilty on all counts.

At sentencing, the court merged counts two, three and four into count one and imposed a forty-two-year sentence subject to NERA after applying aggravating factors three, six and nine. See N.J.S.A. 2C:44-1(a)(3)(6) and (9). The court did not find any mitigating factors applicable, but concluded that factors one, two and five under Miller v. Alabama, 567 U.S. 460, 478 (2012), as adopted by our Supreme Court in State v. Zuber, 227 N.J. 422, 429 (2017), weighed in defendant's favor. The court also sentenced defendant to a separate five-year custodial term as to count five with a three-and-one-half period of parole ineligibility, ran the sentences concurrently, and imposed applicable fines and penalties. This appeal followed.

II.

In his initial point, defendant argues that the court incorrectly ruled that his statement to Detectives McNally and Abarno could be used for impeachment purposes, despite the State's concession that it was elicited in violation of defendant's Sixth Amendment rights, and in doing so, "placed an impermissible burden on his right to testify in his own defense." He supports his argument on three separate, but related, bases.

He first contends, relying on United States v. Brown, 699 F.2d 585 (2d Cir. 1983), and People v. Gonyea, 421 Mich. 462 (1984), that the court improperly relied on Burris, as that holding was grounded on violations of the Fifth Amendment. As such, any attendant "voluntariness" inquiry would be structurally inapplicable to a Sixth Amendment violation like that committed by Detectives McNally and Abarno. Second, defendant maintains the court's decision is contrary to our State's robust Sixth Amendment jurisprudence which has relied on our Constitution to provide citizens with greater protections than those afforded under the Federal Constitution. Third, he argues the court's decision is contrary to New Jersey statutory authority and Supreme Court precedent that provides juveniles with "special protections" when subject to interrogation. State ex rel. A.W., 212 N.J. 114, 128 (2012). We disagree with all these arguments.

We apply a de novo standard of review in construing the "meaning of a constitutional provision or a statute." Gormley v. Wood-El, 218 N.J. 72 (2014). Under that plenary analysis, we do not defer to the court's interpretation of the Sixth Amendment. Id. at 87.

As noted, because his statements were elicited in violation of his Sixth Amendment right to counsel, defendant contends that the statements may not be admitted under any circumstances, including impeachment. Defendant argues

that the impeachment exception noted in Burris applied only to violations of the Fifth Amendment, and not to the Sixth Amendment violation at issue here.

In Burris, the Court held that a statement taken in violation of the Fifth Amendment privilege against self-incrimination, though inadmissible in the prosecution's case-in-chief, is nonetheless admissible for impeachment purposes. Burris, 145 N.J. at 529. Before admission, however, the statement must be found to be "trustworthy and reliable in that it was given freely and voluntarily without compelling influences." Id. at 525.

Defendant argues the Burris rule has no application when the police violated a defendant's Sixth Amendment rights, and as noted, cites Brown, 699 F.2d at 587 and Gonyea, 421 Mich. at 462, in support. In those cases, both courts precluded the government from introducing defendant's uncounseled, post-indictment statements for any purpose, including impeachment. Brown, 699 F.2d at 590; Gonyea, 421 Mich. at 480-81. We disagree and note that Brown and Gonyea[2] are not accurate reflections of the current state of the law on the issue.

---

[2] We note that Gonyea was a plurality decision of the Michigan Supreme Court, and since then, relying on Michigan v. Harvey, 494 U.S. 344, 349 (1990), the Michigan Court of Appeals has held that a defendant's statements elicited in violation of his Sixth Amendment right to counsel, though inadmissible as substantive evidence, were admissible for impeachment purposes. People v. Frazier, 270 Mich. App. 172, 182 (2006), rev'd on other grounds, 478 Mich. 231

In <u>Harvey</u>, 494 U.S. at 349 (1990), the United States Supreme Court first held that a statement obtained from a defendant in violation of the Sixth Amendment could be used to impeach his inconsistent testimony at trial. The Court expanded on this ruling in <u>Kansas v. Ventris</u>, 556 U.S. 586, 592 (2009), when it held that the violation of the Sixth Amendment right to counsel is infringed at the time of the uncounseled interrogation, and that voluntary statements obtained in violation of a defendant's Sixth Amendment right to counsel were admissible to impeach a defendant's inconsistent testimony at trial. In doing so, Justice Antonin Scalia explained:

> Whether otherwise excluded evidence can be admitted for purposes of impeachment depends upon the nature of the constitutional guarantee that is violated. Sometimes that explicitly mandates exclusion from trial, and sometimes it does not. The Fifth Amendment guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial, whether by way of impeachment or otherwise. The Fourth Amendment, on the other hand, guarantees that no person shall be subjected to unreasonable searches or seizures, and says nothing about excluding their fruits from evidence; exclusion comes by way of deterrent sanction rather than to avoid violation of the substantive guarantee. Inadmissibility has not been automatic, therefore, but we have instead applied an exclusionary-rule balancing test. The same is true for violations of the Fifth and Sixth Amendment

---

(2007). On appeal, the Michigan Supreme Court did not disturb this holding, and has not since ruled on the issue. <u>People v. Frazier</u>, 478 Mich. 231, 235 (2007).

A-2694-18

> prophylactic rules forbidding certain pretrial police conduct.
>
> [Ventris, 556 U.S. at 590-91 (internal citations omitted).]

Applying that balancing test, Justice Scalia reasoned that suppressing statements obtained in violation of the Sixth Amendment right to counsel for impeachment purposes would be an improper remedy for the constitutional violation, and would provide defendant "with a shield against contradiction of his untruths." Id. at 594 (quoting Walder v. U.S., 347 U.S. 62, 65 (1954)). Justice Scalia further explained the "need to prevent perjury and to assure the integrity of the trial process" outweighed any interest in excluding the statements. Ibid. (quoting Stone v. Powell, 428 U.S. 465, 488 (1976)).

Accordingly, the Ventris Court found no reason to expand the exclusionary rule, finding no additional deterrent motivations for police to avoid obtaining statements that might be later used for impeachment. Ventris, 556 U.S. at 593. As Justice Scalia explained, "[a]n investigator would have to anticipate both that the defendant would choose to testify at trial (an unusual occurrence to begin with) and that he would testify inconsistently despite the admissibility of his prior statement for impeachment." Ibid. (emphasis in original). These circumstances are not likely to occur, "or at least not likely enough to risk squandering the opportunity of using a properly obtained statement for the prosecution's case-in-chief." Ibid.

The majority of circuit courts have similarly held that statements obtained in violation of a defendant's Sixth Amendment right to counsel may be used for impeachment purposes. See Gardner v. Galetka, 568 F.3d 862, 875 (10th Cir. 2009) (Defendant is not licensed "to perjure himself without threat of refutation using his prior statements," even if the elicitation of those statements violated defendant's rights under the Fifth and Sixth Amendments.); United States v. Danielson, 325 F.3d 1054, 1067 (9th Cir. 2003), as amended (May 19, 2003) (Any statements gathered in violation of defendant's Sixth Amendment right to counsel "must be excluded from the government's case-in-chief, although 'they are admissible to impeach conflicting testimony by the defendants,' provided the statements were voluntary.") (quoting Harvey, 494 U.S. at 349-53 (1990)).[3]

---

[3]  See also United States v. Fellers, 397 F.3d 1090, 1097 (8th Cir. 2005) (allowing defendant's "uncounseled statements obtained in violation of the Sixth Amendment [to] be used at trial for impeachment purposes"); McGriff v. Dep't of Corr., 338 F.3d 1231, 1236 (11th Cir. 2003) (addressing the right to counsel under the habeas corpus statute, but noting "statements obtained in violation of a defendant's Fifth or Sixth Amendment right to counsel cannot be used in the prosecution's case-in-chief against the defendant, but may be used for impeachment purposes"); United States v. Bender, 221 F.3d 265, 271 (1st Cir. 2000) (stating that the government was not precluded from using defendant's incriminating statements, obtained in violation of his Sixth Amendment rights, "if knowing and voluntary, for the purpose of impeachment, if he testifies"); United States v. Laury, 49 F.3d 145, 150 (5th Cir. 1995) ("It is well established that the prosecution may use a statement obtained in violation of the Sixth Amendment to impeach a defendant's false or inconsistent testimony."); United States v. Lott, 854 F.2d 244, 249 (7th Cir. 1988) (Defendant's testimony obtained in violation of his Sixth Amendment right to counsel was admissible

A-2694-18

Based on the aforementioned authority, we are satisfied that the court did not err when it concluded that defendant's statements to detectives were admissible to impeach him should he testify. We acknowledge that <u>Ventris</u> and <u>Harvey</u> were based upon rights enumerated by the Federal Constitution, and as our Supreme Court has recently re-emphasized, the United States Constitution

for impeachment purposes at trial because "[t]o hold otherwise would pervert [defendant]'s Sixth Amendment right to counsel into a right to commit perjury.").

Numerous state courts have also concluded that statements obtained in violation of the Sixth Amendment may be admitted for impeachment purposes. See <u>Phillip v. State</u>, 225 P.3d 504, 514 (Wyo. 2010) ("[E]ven if the evidence was unlawfully obtained because a defendant's right to counsel was not properly observed, the evidence may still be used for impeachment purposes."); <u>People v. Brown</u>, 42 Cal. App. 4th 461, 463-74 (1996) (holding "that the exclusion of a defendant's voluntary statements, obtained in violation of the Sixth Amendment right to counsel, from the case-in-chief sufficiently vindicates the defendant's Sixth Amendment rights," and explaining that "when the defendant takes the stand and testifies inconsistently with those statements, protection of the truth-finding purpose of a criminal trial requires that such statements be admissible for impeachment"); <u>State v. Mattatall</u>, 603 A.2d 1098, 1114-15 (R.I. 1992) ("In no way should the exclusionary rules enunciated by the Supreme Court . . . be perverted by any defendant into a license to commit perjury."); <u>Com. v. Batson</u>, 396 Pa. Super. 513, 517 (1990) (relying on <u>Harvey</u> and holding that a statement made by appellant that was "given voluntarily and of free will" could not be admitted in the prosecution's case-in-chief, but was amissible for impeachment purposes); <u>Martinez v. United States</u>, 566 A.2d 1049, 1059 (D.C. 1989) (holding that "a voluntary statement obtained in violation of a defendant's Sixth Amendment right to counsel may be used at trial to impeach the contrary or inconsistent testimony of that defendant"); <u>State v. Swallow</u>, 405 N.W.2d 29, 39 (S.D. 1987) ("While we agree that the right to counsel is of great importance to our system of justice, we do not believe that this right should be contorted into a rule that would effectively countenance perjury.").

A-2694-18

"provides the floor for constitutional protections, and our own Constitution affords greater protection for individual rights than its federal counterpart." State v. Melvin, 248 N.J. 321 (2021).

For example, New Jersey provides greater protection from unreasonable searches and seizures than does the Fourth Amendment, see State v. Carter, 247 N.J. 488, 529-30 (2021), from self-incrimination than does the Fifth Amendment, see State v. O'Neill, 193 N.J. 148, 176-77 (2007); and from cruel and unusual punishment in the context of the Eighth Amendment, see Zuber, 227 N.J. at 438. In the context of the Sixth Amendment, we have clarified that "[w]here the language of our State Constitution contains similar language, as Article I, paragraph 10 does regarding the Sixth Amendment, there should be some intent or historical support for the proposition that our drafters were providing something different than the drafters of the federal constitution." State v. Daniels, 364 N.J. Super. 357, 371 (App. Div. 2003), rev'd on other grounds, 182 N.J. 80 (2004).

Relying on these principles generally, and on State v. Sanchez, 129 N.J. 261, 275 (1992) specifically, defendant argues that in New Jersey, "a right to counsel violation after indictment implicates a state-based right which preceded the Sixth Amendment, and thus, demands an even higher waiver standard." In Sanchez, the defendant moved to suppress his uncounseled, post-indictment

confession, arguing that it violated his Sixth Amendment right to counsel, even though he had been read his Miranda rights and signed a waiver form. Id. at 262. The trial court admitted the statement, concluding that defendant had never requested counsel, and he made a knowing and voluntary wavier of his rights. Ibid. We affirmed.

Our Supreme Court reversed, and declined to apply the United States Supreme Court's holding in Patterson v. Illinois, 487 U.S. 285, 298 (1988), that "Miranda warnings adequately alert an accused of the right to counsel and of the consequences of a decision to waive his or her Sixth Amendment rights during post-indictment questioning." The Sanchez Court noted that New Jersey has long protected a broader right to counsel than the Federal Constitution and emphasized New Jersey's "traditional commitment to the right to counsel." Id. at 274-75. The Court reasoned that the indictment "transforms the relationship between the State and the defendant" and begins a stage of the proceedings in which the "prosecutor and the defendant are adversaries." Id. at 276.

As such, the court concluded, "the perfunctory recitation of the right to counsel and to remain silent may not provide the defendant with sufficient information to make a knowing and intelligent waiver" because these warnings do not inform the defendant of "the nature of the charges, the dangers of self-representation, or the steps counsel might take to protect the defendant's

interests." Id. at 276-77. The Court determined that "[a]s a general rule, after an indictment and before arraignment, prosecutors or their representatives should not initiate a conversation with defendants without the consent of defense counsel." Id. at 277.

We are not persuaded that the holding in Sanchez, or the other authority cited by defendant, supports his argument that the violation of defendant's right to counsel under Article 1, paragraph 10 of the New Jersey Constitution, or the Sixth Amendment, required his statement to be excluded for all purposes, including impeachment. We reach that conclusion because we agree with the Ventris Court's reasoning that "preventing impeachment use" of defendant's statement "would add little appreciable deterrence" to police conduct. Id. at 593.

Our conclusion is further supported by the fact that no New Jersey court of which we are aware has so broadly interpreted a defendant's Sixth Amendment rights to effectively allow an accused to lie affirmatively regarding a non-coerced statement without permitting the State the opportunity to engage in direct impeachment. That principle is particularly relevant here: if defendant's statement, which his counsel stipulated was entered voluntarily, was barred from use at trial for all purposes, defendant could conceivably take the witness stand and blame the murder on Mooch, and not the unidentified, mysterious, hooded man who he told detectives emerged from the darkness to

kill the victim for no known purpose. Under defendant's proposed interpretation of the Sixth Amendment, the State would be without recourse to confront him directly with the most damaging evidence against him on that point—his own statement.

Nor, in our view, does defendant's juvenile status compel a contrary result. In reaching this conclusion, we fully acknowledge that our State has "long accorded juveniles special protections when they are subjected to [custodial] interrogation." State ex rel. A.W., 212 N.J. 114, 128 (2012). We do so because juveniles are "typically less mature, often lack judgment, and are generally more vulnerable to pressure than adults," great care must be taken to ensure a juvenile's statement is voluntary, and "'not the product of ignorance of rights or of adolescent fantasy, fright or despair.'" State In Int. of A.A., 240 N.J. 341, 354 (2020) (quoting In re Gault, 387 U.S. 1, 55 (1967)).

In particular, "a parent or legal guardian should attend a juvenile interrogation whenever possible to help assure that any waiver of rights by the juvenile is the product of free will." State v. Presha, 163 N.J. 304, 322 (2000). This is so because a parent "can offer a measure of support in the unfamiliar setting of the police station." Id. at 314. If an adult is unavailable or declines to accompany the minor, police must conduct an interrogation "'in accordance with the highest standards of due process and fundamental fairness.'" Id. at 317

(quoting State ex rel. S.H., 61 N.J. 108, 115, (2004)). In the context of the Fifth Amendment, courts must consider the "totality of the circumstances" in evaluating the voluntariness of a juvenile's statement, and the presence of a parent is an important factor in that determination. Id. at 321.

Our courts further recognize "the profound importance of a decision to waive a minor accused of an offense to the adult criminal court" due to "the fundamental difference between juvenile courts that focus on rehabilitation of youths and adult criminal courts that are more focused on deterrence and punishment." State in Int. of E.S., 470 N.J. Super. 9, 17 (App. Div. 2021). Juveniles are entitled to various procedural protections before waiver to adult court, and must "receive a hearing, effective assistance of counsel who have access to relevant information, and a statement of reasons for the court's decision." State in Int. of N.H., 226 N.J. 242, 253 (2016). Indeed, at these hearings, juveniles are afforded "greater rights than adults have at comparable probable cause hearings." Ibid.

Further, the waiver process is carefully crafted to ensure juveniles who commit only enumerated delinquent acts are tried in adult court, see N.J.S.A. 2A:4A-26.1(c)(2), and has recently been revised to require even greater protections for juveniles. In 2016, the Legislature raised the minimum age for eligibility for waiver from fourteen to fifteen, see N.J.S.A. 2A:4A-26.1(c)(1),

and required any "wavier motion to be 'accompanied by a written statement of reasons' from the prosecutor." State in Int. of Z.S., 464 N.J. Super. 507, 516 (App. Div. 2020) (quoting N.J.S.A. 2A:4A-26.1(a)). This statement of reasons must "'clearly set[] forth the facts used in assessing all [of the enumerated waiver] factors . . . together with an explanation as to how evaluation of those facts supports waiver for each particular juvenile.'" Ibid. (quoting N.J.S.A. 2A:4A-26.1(a) (emphasis in original)). Those eligibility factors include the nature and circumstances of the offense, the degree of the juvenile's culpability, the juvenile's age and maturity, the degree of criminal sophistication, prior history of delinquency, among others. See N.J.S.A. 2A:4A-26.1(c)(3).

Recent developments in New Jersey sentencing law provide juveniles with further protections. In Zuber, 227 N.J. at 451, our Supreme Court held that judges must "take into account how children are different," and consider the factors enumerated in Miller v. Alabama, 567 U.S. 460, 479 (2012), before sentencing juveniles to life imprisonment without the possibility of parole or its practical equivalent. Zuber, 227 N.J. at 429. These factors include "immaturity and 'failure to appreciate risks and consequences'; 'family and home environment'; family and peer pressures; 'an inability to deal with police officers or prosecutors' or the juvenile's own attorney; and 'the possibility of rehabilitation.'" Ibid. (quoting Miller, 567 U.S. at 477-78).

Beyond the Miller factors, our Legislature also recently revised the sentencing criteria to require sentencing courts to consider a defendant's youthful status as an independent factor in the sentencing calculus. See N.J.S.A. 2C:44-1(b)(14). The court must consider defendant's age in mitigation of any aggravating factor if "defendant was under twenty-six years of age at the time of the commission of the offense." L. 2020, c. 110 (eff. Oct. 19, 2020).

In addition, in P.M.P., 200 N.J. at 177, the Court held that the Code of Juvenile Justice requires a juvenile defendant "to have 'counsel at every critical stage of the proceeding which, in the opinion of the court may result in the institutional commitment of the juvenile.'" Ibid. (quoting N.J.S.A. 2A:4A–39(a)). Thus, because the filing of the juvenile complaint by a prosecutor's office, followed by the issuance of a judicially approved arrest warrant, constituted a "critical stage" of the proceedings, the Court concluded that the statutory right to counsel was implicated, and the defendant could not waive his Miranda rights in the absence of his attorney. Id. at 177-78.[4]

---

[4] Defendant also relies upon N.J.S.A. 2A:4A-38 and N.J.S.A. 2A:4A-39 to support his argument that juveniles, even those waived to adult court, should receive special protections under our evidence Rules. We acknowledge these protections provided by the Code of Juvenile Justice, but we are not persuaded that these statutory provisions apply here. Defendant was not denied representation at a detention hearing, N.J.S.A. 2A:4A-38, and his statements from a waiver proceeding were not introduced at trial, N.J.S.A. 2A:4A-39.

Defendant argues the Presha "voluntariness inquiry" has "no place" once a juvenile delinquency complaint has been filed, and urges us to draw a bright-line rule declaring all statements given by a juvenile in the absence of an attorney per se involuntary and inadmissible for any purpose. We decline to do so and note that here, defendant's counsel conceded his statement was not coerced and determined an N.J.R.E. 104 hearing on the issue was not required.

We are satisfied that any inherent impulsivity or vulnerability due to defendant's age has been remedied by the preclusion of his statement in the prosecution's case-in-chief. Further, we do not believe the aforementioned jurisprudence, including Zuber and P.M.P., would be contravened by preventing the State from impeaching defendant with his inconsistent statements. In sum, we are not persuaded that New Jersey's juvenile protections should be expanded so far such that a juvenile waived to adult court is permitted to lie[5] under oath, without permitting the State the opportunity to confront defendant with his or her prior inconsistent statement.

---

[5] We do not presume that a defendant's uncounseled statement to the police was necessarily truthful and that his contrary testimony at trial is necessarily false. What we are saying is that the State is entitled to impeach the defendant at trial to highlight the disparity.

## III.

In his second point, defendant contends that because the State's case relied heavily upon eyewitness testimony, the court erred in failing to instruct the jury that the "State has the ultimate burden of proving the identity of the perpetrator beyond a reasonable doubt." He also argues that by failing to provide any instruction on identification, premised on Simmons' "middle-of-the-night, yards-away, through-her-rear-view-mirror identification of someone she barely knew," the court violated State v. Henderson, 208 N.J. 208, 218 (2011), as well as his Fourteenth Amendment rights under our Federal and State Constitutions in failing to provide "enhanced instruction" consistent with that case. We find no merit in these arguments.

We review a "missing instruction on identification . . . for plain error." State v. Sanchez-Medina, 231 N.J. 452, 468 (2018). "Any error or omission shall be disregarded . . . unless it is of such a nature as to have been clearly capable of producing an unjust result." Ibid. The possibility of such an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

Further, any alleged plain "error must be evaluated 'in light of the overall strength of the State's case.'" Sanchez-Medina, 231 N.J. at 468 (quoting State

v. Galicia, 210 N.J. 364, 388 (2012)).  Defendant carries the burden of showing plain error.  State v. Morton, 155 N.J. 383, 421 (1998).

In Henderson, the defendant challenged an identification on the ground police officers had unduly influenced the eyewitness.  208 N.J. at 217.  The eyewitness initially expressed doubt about the identity of the perpetrator but was able to confidently identify the defendant after meeting with investigators.  Id. at 223-24.  The Court identified numerous factors that can affect the ability of a witness to remember and identify perpetrators, resulting in misidentifications, and ordered an amplified, comprehensive jury charge.  Id. at 298-99.  The Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. July 19, 2012) was then drafted and adopted by the Court.

In Sanchez-Medina, the Court made clear that "[w]hen eyewitness identification is a 'key issue' the trial court must instruct the jury how to assess the evidence—even if defendant does not request the charge."  Id. at 466 (quoting State v. Cotto, 182 N.J. 316, 325 (2005)).  For the failure to deliver the charge to be plain error, however, identification must be "a critical issue at trial that defendant disputed."  Id. at 469; see also Cotto, 182 N.J. at 325.  An issue is made a "key issue" if it is "the major, if not the sole, thrust of the defense."  State v. Green, 86 N.J. 281, 291 (1981).  And we must also consider the error

"in light of 'the totality of the entire charge, not in isolation.'" Ibid. (citation omitted).

Defendant relies on State v. Davis, 363 N.J. Super. 556, 560 (App. Div. 2003) for the proposition that trial courts have a duty, "even absent a request, to present the model charge on identification." The defendant in Davis was convicted of distributing cocaine within 1000 feet of a school after he purportedly sold it to an undercover Drug Enforcement Agency (DEA) officer who had never met defendant before the transaction, and identified him twenty-five minutes after the sale through a single photo. Id. at 559. Describing defendant's case as "squarely one of misidentification," we concluded the absence of a detailed identification charge constituted plain error. Ibid.

Defendant also relies on Green, 86 N.J. at 291-292, for the authority that "a missing instruction on identity can almost never be harmless when there is only a single other eyewitness who makes an identification at trial." In that case, the victim (and only eyewitness) was attacked at night by an assailant who remained behind her while they walked to a dimly lit spot where he raped her. Id. at 291. Her initial description of the assailant was a man five inches shorter and thirty pounds lighter than the defendant, and it did not refer to defendant's chipped tooth, a detail she provided several months after the assault. Ibid. Based on these circumstances, the Court noted that there was no corroboration

or forensic evidence so that the danger of a mistaken identification was "particularly significant." Ibid. Because the trial court failed to charge the jury that it was the State's burden to prove beyond a reasonable doubt that it was the defendant who had raped the victim, the Court reversed and remanded for a new trial. Id. at 293.

The witnesses in this case are unlike the victim-witness in Green or the DEA officer in Davis. Both Keil and Simmons knew defendant from prior interactions in school, and Keil occasionally socialized with defendant. Further, while neither specifically identified defendant in their original statements, they unequivocally identified him in later statements and at trial. Alyssa Parvesse also testified that both women told her "Choppy" was responsible for Melvin's death immediately after the incident.

Defendant's argument also incorrectly presupposes that an eyewitness identification instruction was appropriate and necessary in this case. This argument fundamentally misconstrues the nature and purpose of that jury charge as, contrary to defendant's argument, eyewitness identification within the meaning of Henderson and its progeny was not a key issue in this case.

The eyewitness identification charge, drafted in accordance with Henderson, is designed to provide guidance to juries in gauging a witness's capacity to testify reliably that the defendant is the person the eyewitness

observed at the scene and time of the crime. Where the eyewitness is someone well known to the person identifying defendant—like in this case—there simply is no significant risk the witness would misidentify the culprit within the meaning of <u>Henderson</u>.

Defendant did not dispute that he was present at the crime scene when the fatal shots were fired. Defendant's argument—reflected in his counsel's opening and closing statements—was that Mooch fired the gun that killed Melvin. Accordingly, the key issue for the jury to decide was not whether Simmons and Keil had misidentified defendant, but rather whether they were truthful when they told the jury they saw defendant shoot the victim.

In these circumstances, the model identification charge explaining the risk of eyewitness misidentification would not have been helpful—and might even have been confusing—in contrast to the witness credibility jury instruction that was given to the jury. Indeed, had the court given instructions regarding as to how the estimator variables affect identification, the jury may well have been even more convinced that Simmons and Keil correctly identified defendant as the shooter. As noted, both knew defendant from school and spent time driving with him in the car prior to the shooting, and even though it was dark, both women were seated in the car only about "a house length away" from defendant.

This case is more similar to <u>State v. Gaines</u>, 377 N.J. Super. 612, 626 (App. Div. 2005), in which we found that the failure to provide an identification instruction did not require reversal because the two eyewitnesses knew the defendant prior to the aggravated manslaughter for which he was convicted, and "[t]heir independent identifications . . . were not dependent upon their ability to observe and recall physical features and characteristics of a person who was a stranger to them." <u>See also</u> <u>State v. Baylor</u>, 423 N.J. Super. 576, 592 (2011). We further observed that the court's other instructions "did not permit the jurors to conclude that they could convict [the] defendant if the State had not established beyond a reasonable doubt that he was the person who fired the fatal shot." <u>Id.</u> at 625.

Here, the jury was clearly instructed that the State must prove beyond a reasonable doubt that defendant committed the crimes for which he was charged. In this regard, the court specifically instructed the jury to determine whether "the State has proven beyond a reasonable doubt that the defendant[ ] violated a specific criminal statute." The court's reasonable doubt charge repeatedly referred to "defendant's guilt." Further, when detailing the elements of each of the charges against defendant, the court repeatedly stated that an element of each is "[t]hat the defendant knowingly or purposely caused the death or serious bodily injury resulting in the death of Shamere Melvin."

Additionally, the court charged the jury to "weigh the testimony of each witness and then determine the weight to give it," specifically asking the jury to consider a witness's "means of obtaining knowledge of the facts" and to the extent the witness is "corroborated or contradicted . . . by other evidence." The court also charged the jury on circumstantial evidence stating "[i]t is not necessary that all the facts be proven by direct evidence" and that a guilty verdict "may be based on . . . circumstantial evidence alone or a combination of direct evidence and circumstantial evidence."

We thus conclude the failure to give the eyewitness identification jury charge was not error, much less plain error capable of producing an unjust result. R. 2:10-2; see also Cotto, 182 N.J. at 326 (noting although "[f]ailure to issue [an identification] instruction may constitute plain error," that "determination . . . depends on the strength and quality of the State's corroborative evidence").

IV.

Defendant further argues the court committed reversible error when it failed to instruct the jury with respect to the intent to commit theft, which "must precede or be coterminous with the use of force," consistent with Lopez, 187 N.J. at 98-99. Defendant maintains the instruction was critical to acquit on robbery and felony murder, and the lack of instruction on defendant's mental state was "plainly prejudicial." We disagree.

A-2694-18

Pursuant to N.J.S.A. 2C:15-1(a)(2), "[a] person is guilty of robbery if, in the course of committing a theft, he . . . [t]hreatens another with or purposely puts him in fear of immediate bodily injury." The State must prove, beyond a reasonable doubt, that the actor's conduct threatens the victim with or purposely puts the victim in fear of immediate bodily injury to compel the victim to give up his money or other property. State ex rel. L.W., 333 N.J. Super. 492, 497 (App. Div. 2000). The analysis is based upon the totality of the circumstances, and there are no special words or conduct required. Ibid.; State v. Smalls, 310 N.J. Super. 285, 292 (App. Div. 1998).

In Lopez, the defendant struck and killed the victim, and thereafter decided to steal the victim's jewelry. Lopez, 187 N.J. at 93. The Court observed that "without the intention to steal evidenced by a theft or attempted theft, there can be no robbery." Id. at 98. Accordingly, the Court held that our robbery statute does not encompass "afterthought robbery," as the intention to steal must precede or be coterminous with the use of force. Id. at 101.

Defendant contends that the trial court incorrectly omitted the following optional portion of the model jury charge on robbery (the Lopez charge):

> To find the defendant guilty of robbery, the intent to commit theft must precede or be coterminous with the use of force. In other words, the defendant must have formed the intent to commit a theft before or during his/her use of force. If you find the defendant formed

the intent to commit a theft after his/her use of force, then he/she cannot be found guilty of robbery.

[Model Jury Charges (Criminal), "Robbery in the First Degree (N.J.S.A. 2C:15-1)" (rev. Sept. 10, 2012).]

As is clear from the record, defendant did not specifically request a Lopez charge. As noted, however he did file two motions – a motion to dismiss certain counts of the indictment and a motion for a judgment of acquittal – that reflected his challenges to the intent element of the robbery charge. Defendant suggests that in light of those previous applications, he effectively preserved the issue, and the court should have given the instruction absent a request. Even were we to indulge that argument, and consider the issue under the harmless error standard, see Willner v. Vertical Reality, Inc., 235 N.J. 65, 80 (2018), as opposed to the plain error standard, we conclude that the jury was appropriately charged on the robbery count.

Lopez does not support defendant's argument. We are satisfied that there was more than sufficient evidence for a reasonable jury to conclude defendant formed the intent to rob Melvin prior to arriving at the scene. After deciding on a drug deal for twice his originally intended quantity, defendant rejected the first meeting location as "too suspicious," because the area was too crowded. He then led Melvin to a more isolated location to conduct the drug deal, deliberately secluding him. Further, defendant arrived to complete the drug transaction with

a gun and his cousin who wore a ski mask, strongly suggesting he planned to steal the marijuana from Melvin.

We also note that the court advised the jury that "an act is considered to be in the course of committing a theft if it occurs in an attempt to commit the theft <u>during the commission of the theft itself or in immediate flight after the attempt or commission</u>."  (emphasis added).  And, the court informed jury that the State must prove beyond a reasonable doubt each element of the crimes, and defined the terms "bodily injury" and "force" in detail.

We next turn to defendant's claim that the court erred when it denied his motion for a judgment of acquittal under <u>Rule</u> 3:18-1, similarly arguing that there was insufficient evidence to support a finding that he formed the intent to steal either before the shooting or concurrent with it.  The question on a motion for acquittal is:

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [<u>Reyes</u>, 50 N.J. at 459.]

If the State's evidence and its favorable inferences can support a guilty verdict, the motion for acquittal should be denied.  <u>State v. Jones</u>, 242 N.J. 156,

168 (2020). Appellate review of the denial of a motion for acquittal is de novo. Ibid.

The court rejected defendant's argument, concluding that "certainly the inference is there that the defendant formed [the] intent to steal the marijuana even before he shot and killed [Melvin]." For the reasons noted, we find no error in this conclusion, as there was ample evidence supporting a finding that defendant formed the intent to commit theft prior to the shooting.

V.

In point four, defendant maintains Detective McNally's testimony "constituted a series of interrelated constitutional and evidentiary violations." Specifically, defendant argues that Detective McNally's testimony violated the Confrontation Clause by invoking a non-testifying witness, violated N.J.R.E. 701 by going beyond the scope of a lay witness, and improperly "vouched" for other witnesses' testimony. Again, we find no merit to these contentions.

A "trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion." State v. Nantambu, 221 N.J. 390, 402 (2015). However, "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard." State v. Singh, 245 N.J. 1, 13 (2021) (quoting R. 2:10-2). We apply the plain error standard as

defendant failed to object to any of Detective McNally's testimony. We address defendant's challenges to the detective's testimony separately.

A. Confrontation Clause

First, defendant argues that Detective McNally's speculation as to Green's refusal to testify violated the Confrontation Clause under the Federal and State Constitutions. Defendant maintains Detective McNally conveyed "superior knowledge" as to defendant's guilt by suggesting the existence of an incriminating out-of-court statement made by Green and inferring that Green "would have identified [defendant] as the murderer if he was braver."

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both provide that the accused in a criminal trial has the right to confront the witnesses against him. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. "[T]he Confrontation Clause of the United States Constitution bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" State v. Slaughter, 219 N.J. 104, 116-17 (2014) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)). Generally, the Confrontation Clause forbids the admission of testimony that is directly or indirectly derived from a non-testifying witness and incriminates a defendant. Branch, 182 N.J. at 350.

Statements "are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006). In contrast, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Ibid. Whether a statement is testimonial under the primary purpose test is "a fact-specific analysis . . . based on the circumstances presented." State v. Bass, 224 N.J. 285, 317 n.9 (2016).

"[A]dmission of an out-of-court testimonial statement violates the Confrontation Clause unless the witness is unavailable and the defendant had an opportunity to cross-examine that witness." State v. Wilson, 442 N.J. Super. 224, 239 (App. Div. 2015); see also U.S. Const. amend. VI; Crawford, 541 U.S. at 59. In State ex rel. J.A., 195 N.J. 324, 348 (2008) our Supreme Court explained that "a declarant's narrative to a law enforcement officer about a crime, which once completed has ended any 'imminent danger' to the declarant or some other identifiable person, is testimonial." (quoting Davis, 547 U.S. at 827).

Our Supreme Court has further emphasized that "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." State v. Bankston, 63 N.J. 263, 271 (1973). In Bankston, 63 N.J. at 268-69, our Supreme Court concluded that both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged.

To protect the defendant from the confrontation problems associated with such evidence, restrictions have been placed on Bankston-type testimony. An officer may explain the reason he approached a suspect or went to a crime scene by stating he did so "upon information received," Banskton, 63 N.J. at 268, but the officer may not become more specific by repeating details of the crime, or implying he received evidence of the defendant's guilt, as related by a non-testifying witness. State v. Luna, 193 N.J. 202, 216–17 (2007).

The Court affirmed and reinforced the Bankston rule in Branch, 182 N.J. at 342. In Branch, an officer testified he had included the defendant's photograph in an array "because he had developed defendant as a suspect 'based on information received.'" Ibid. The Court determined the officer's testimony was inadmissible hearsay, engendering a jury that "was left to speculate that the

detective had superior knowledge through hearsay information implicating defendant in the crime." Id. at 348. The Court noted "[b]ecause the [informant] . . . was not called as a witness, the jury never learned the basis of [the informant's] knowledge regarding defendant's guilt, whether he was a credible source, or whether he had a peculiar interest in the case." Ibid. The Court emphasized that the introduction of this "gratuitous hearsay testimony violated defendant's federal and state rights to confrontation" and concluded that the violation was sufficiently prejudicial, warranting reversal as plain error. Id. at 354.

We also evaluate defendant's arguments against State v. Irving, 114 N.J. 427, 447-448 (1989), where our Supreme Court held admission of a detective's hearsay testimony did not amount to plain error, as there was substantial credible evidence elsewhere in the record to support the guilty verdict. There, the defendant argued that the detective's testimony produced an "inescapable inference . . . that an unidentified informant, who was not . . . subject to cross-examination, had told [the detective] that [defendant] had committed the crime." Id. at 445. The Court rejected this argument, however, where, among other evidence, two eyewitnesses identified the defendant both in and out of court. Id. at 448.

As noted, defendant did not object to Detective McNally's testimony, and we are satisfied that the court did not commit error by admitting his statements regarding Green. We note that Green's statements, as recounted by Detective McNally, did not place defendant at the scene. Detective McNally explained that he reached out to Green after speaking with witnesses at the scene, because he believed Green had been a witness to the murder. He testified that Green told him he was "hanging with [Melvin]" near the murder that night, and as noted, heard a gunshot and found Melvin lying on the ground.

In addition, as Green was largely uncooperative with detectives, he never provided police with a formal statement and insisted he did not witness the murder. Detective McNally repeatedly testified that Green told him, "he was not there when it happened [and] he did not witness it." Unlike in Irving, there was no inference to be drawn that a non-testifying witness provided police with evidence of defendant's guilt.

As such, we are satisfied Green's statements that he was with Melvin that evening, only to soon after found him dead on the sidewalk, did not directly implicate defendant, unlike the non-testifying witnesses in Bankston and Branch. Although Green's statements are likely testimonial in nature, as they were given to detectives in order to "establish or prove past events potentially relevant to later criminal prosecution," Davis, 547 U.S. at 822, and Detective

A-2694-18

McNally's statements hearsay, we are not persuaded that the allowance of this testimony amounted to plain error.

B. Improper Lay Opinion

Defendant next argues that Detective McNally offered improper lay opinion testimony. He contends Detective McNally's testimony, as detailed supra at pp. 12-14, invaded the province of the jury, contrary to N.J.R.E. 701 and State v. McLean, 205 N.J. 438, 453 (2011), when he attributed both Keil's initial lack of candor and Green's failure to testify to their fear. Defendant also maintains that these statements improperly "vouched" for Keil's testimony, contrary to State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004). Defendant argues that because Keil omitted certain information in her original statement to police, and only later came forward with information about defendant's involvement, Detective McNally's testimony "encouraged the jury to credit her most recent testimony because she purportedly overcame her 'legitimate' fear." As to Green, because he did not come forward, defendant maintains that Detective McNally's testimony inferred that Green had not overcome his fear and therefore possessed incriminating information.

Defendant also contends Detective McNally's testimony violated N.J.R.E. 701 when he relied upon his experience to opine on Lopez's deleted Facebook messages and the lack of forensic evidence in the case, thereby implicitly

"ask[ing] the jury to consider him an expert," and offering testimony on the ultimate issue of defendant's guilt. Finally, defendant asserts these errors were compounded when the State referenced Detective McNally's testimony in summation, contrary to Walden, 370 N.J. Super. at 560.

N.J.R.E. 701, which governs lay witness opinion testimony, states: "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." "The purpose of N.J.R.E. 701 is to ensure that lay opinion is based on an adequate foundation." Neno v. Clinton, 167 N.J. 573, 585 (2001); see also Singh, 245 N.J. at 14. Lay opinion testimony can be admitted "[only] if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." McLean, 205 N.J. at 456.

Opinion testimony may not "intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out . . . [or] express a view on the ultimate question of guilt or innocence." McLean, 205 N.J. at 453. "[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460. To be admissible, lay opinion testimony must

be founded on a witness's perception which must "rest[] on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Id. at 457.

Accordingly, lay opinion testimony is impermissible when it constitutes "an expression of a belief in defendant's guilt" and "an opinion on matters that were not beyond the understanding of the jury." Id. at 463. Stated differently, lay opinion testimony is impermissible if is "not within [the witness's] direct ken . . . and as to which the jury is as competent as [the witness] to form a conclusion." Id. at 459 (alterations in original) (quoting Brindley Fireman's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). For police officers, lay opinions may not "convey information about what the officer 'believed,' 'thought' or 'suspected.'" Id. at 460.

In addition, lay witnesses, including police officers, may not "improperly bolster or vouch for an eyewitness's credibility and thus invade the jury's province." State v. Lazo, 209 N.J. 9, 24 (2012). While a prosecutor may argue that a witness is credible, the prosecutor may not "personally vouch for the witness or refer to matters outside the record as support for the witness's credibility." Walden, 370 N.J. Super. at 560.

Police testimony concerning a defendant's guilt or veracity is particularly prejudicial because "[a] jury may be inclined to accord special respect to such a

witness," and where that witness's testimony goes "to the heart of the case," deference by the jury could lead it to "ascribe[] almost determinative significance to [the officer's] opinion." State v. Tung, 460 N.J. Super. 75, 102 (App. Div. 2019) (quoting Neno, 167 N.J. at 586-87); see also State v. Frisby, 174 N.J. 583, 595 (2002) (finding the admission of certain police testimony to be plain error, noting "[t]he effect of the police testimony essentially vouching for" the version of events contrary to a defendant's version "cannot be overstated").

Expert opinion testimony is permitted if the subject matter is beyond the ken of the average juror. State v. Kelly, 97 N.J. 178, 208 (1994). If the matter is within the jury's competence, expert testimony is unnecessary. State v. Sowell, 213 N.J. 89, 99 (2013).

In McLean, 205 N.J. at 460-63, our Supreme Court explained certain restrictions upon the ability of prosecutors to present lay opinion testimony from police officers who have not been proffered by the State as expert witnesses. The Court specifically considered testimony given by a police officer who had participated in an investigation that led to the defendant's prosecution for possession of controlled dangerous substances (CDS) and possession of CDS with intent to distribute. Id. at 443-47. The officer testified that he had observed the defendant engage in two transactions, in both instances some unidentified

item had been exchanged for money.  Id. at 443-44.  Over defense counsel's objection, the prosecutor asked the officer, "[s]o based on your own experience sir, and your own training, what did you believe happened at that time?"  Id. at 446.  The trial court permitted the officer, who had not been qualified as an expert witness, to testify that, based on his experience, he believed he had observed a drug transaction.  Ibid.

The Court held in McLean that the police officer's statement was inadmissible as a lay opinion because it was an expression of a belief in the defendant's guilt and it offered an opinion on matters that were not beyond the understanding of the jury.  Id. at 463; see also N.J.R.E. 701.  The Court ruled that an officer testifying as a lay or fact witness may not testify about his belief that a transaction he observed was a narcotics sale.  Id. at 461.  "To permit the lay opinion rule to operate in that fashion would be to authorize every arresting officer to opine on guilt in every case."  Ibid.

The McLean Court further concluded in that the references to the lay witness police officer's "training and experience, coupled with the request that he testify about his belief as to what had happened, impermissibly asked for an expert opinion from a witness who had not been qualified to give one."  Id. at 462.  As noted, only if a police officer is properly qualified as an expert witness may he or she give testimony explaining the implications of observed behaviors

that may be beyond the understanding of an average juror.  Id. at 460-61; see also N.J.R.E. 702.

As noted, we consider defendant's arguments under the plain error standard, as he did not object to the testimony at trial.  The application of this standard of review is illustrated by our Supreme Court's recent opinion in Singh, 245 N.J. at 14.  In Singh, a surveillance video captured an armed robbery, and the arresting officer referred to defendant as "the defendant" twice while narrating the surveillance footage at trial.  245 N.J. at 5-7.  The court also permitted the officer to testify that the sneakers worn by the perpetrator in the surveillance video were similar to the sneakers worn by the defendant when the officer encountered him shortly after the robbery.  Id. at 8.

The Court's majority in Singh reasoned that the passing references to "defendant" in the video were erroneous but were not capable of producing an unjust result.  Id. at 17.  Other circumstantial evidence, such as the defendant's sweaty "physical state" and his proximity to other evidence when found close by the crime scene, rendered the opinion references "not so prejudicial as to meet the plain error standard."  Id. at 18.

The Court also concluded that the officer's testimony about the similarity of the sneakers met the requirements of N.J.R.E. 701(a).  Id. at 19.  Although the officer had not witnessed the crime, he had firsthand knowledge of the

sneakers in the immediate aftermath of the crime because he saw them as he was arresting the defendant.  Id. at 19-20.

As the Singh majority noted, New Jersey courts have allowed officers to testify as lay witnesses based upon their personal experience and observations in various circumstances, even "where expert testimony might otherwise be deemed necessary."  State v. LaBrutto, 114 N.J. 187, 198 (1989).  In LaBrutto, a police officer was permitted to testify to his own observations with respect to the point of impact in a car accident, even though he was "not qualified as an accident-reconstruction expert."  Id. at 200.  The Court reasoned that the officer's opinion was rationally based on his observations at the scene, and helpful to the jury.  Ibid.

We begin with Detective McNally's testimony about the statements given by Keil and Green.  Detective McNally attributed Green's lack of cooperation to a "fear of retaliation" and a desire not "to be involved."  Discussing Keil's multiple statements, he stated that it is "not uncommon" for witnesses to be less than forthcoming in the first statements they give to police, suggesting that witnesses may be "afraid," or "accidentally leave [information] out."  Defendant maintains that this testimony is "exactly the harm contemplated by McLean."  We disagree.

Detective McNally never testified that he "believed" Keil or Green were afraid of defendant. Rather, Detective McNally made these comments in the context of explaining his investigatory process. When asked why Keil gave multiple statements to the police, Detective McNally noted that one of the prosecutors retired during the course of the investigation, and the State brought Keil in for her to meet the new prosecutor and make another formal statement. At that time, Detective McNally testified that she provided "additional information" that she had not reported in previous statements. Detective McNally contextualized that comment, as evidenced by the following colloquy:

> [PROSECUTOR]: Detective, in the course of your experience investigating over a hundred homicides as an assisting detective and [twenty] to [twenty-five] as a lead, is it uncommon for witnesses to provide information in bits and pieces?
>
> [DETECTIVE MCNALLY]: No, it's not uncommon.
>
> [PROSECUTOR]: In your experience, why does that happen?
>
> [DETECTIVE MCNALLY]: It's multiple reasons. Sometimes they intentionally forget -- or they intentionally leave it out. Sometimes they accidentally leave it out. When you're interviewing these witnesses, you're coming at them with a lot of things, they have a lot of information, a lot that they just don't get, and sometimes they leave things out. It's not intentional. Other times, people are afraid. They don't want to be involved, and they figure if they don't give all the details that they're not going to be needed down the road.

A-2694-18

52

These statements, while not an account of Detective McNally's direct observations, do not "bolster" or "vouch" for the testimony of Keil. Lazo, 209 N.J. at 24. The detective stated that there are "multiple reasons" that witnesses may be less than forthcoming, fear being only one of them. Detective McNally at no point testified with respect to what he "believed, thought or suspected" regarding defendant's guilt and never specifically opined on any one witness's actions. McLean, 205 N.J. at 460. Further, Keil herself testified at trial that she left out details in her original statement because she was "scared," and the jury had the opportunity to evaluate her credibility.

We also reject defendant's argument that Detective McNally's testimony regarding defendant's Facebook messages constituted improper lay opinion testimony. These statements did not express a view on defendant's guilt, nor did he offer this testimony under the "guise" of an opinion. See McLean, 205 N.J. at 453. Rather, Detective McNally again contextualized the State's Facebook exhibits based upon his own personal observations and what he "directly perceived" during the course of his investigation. He never stated that he "suspected" defendant deleted the messages because of their incriminating nature, but reasoned that the messages had been deleted once he compared defendant's account to Keil's, and saw messages between the two that did not exist on defendant's account.

A-2694-18

Similarly, we find no merit to defendant's contention that the court improperly admitted Detective McNally's testimony regarding his experience with homicide investigations in violation of N.J.R.E. 701 and 702. Defendant argues the Detective's testimony that, in his experience, law enforcement rarely uncovers DNA or fingerprint evidence in homicide investigations inappropriately opined on the strength of the evidence. On cross-examination, Detective McNally testified:

> [DEFENSE COUNSEL]: Detective McNally, there was no fingerprint evidence that came back linking [defendant] to this murder, correct?
>
> [DETECTIVE MCNALLY]: That's correct.
>
> [DEFENSE COUNSEL]: And there was no DNA evidence linking my client to this murder, correct?
>
> [DETECTIVE MCNALLY]: That's correct.
>
> [DEFENSE COUNSEL]: No surveillance footage linking my client to this murder, correct?
>
> [DETECTIVE MCNALLY]: Correct.
>
> [DEFENSE COUNSEL]: You never tested [defendant] for any gunshot residue, correct?
>
> [DETECTIVE MCNALLY]: Correct.
>
> [DEFENSE COUNSEL]: No gun was found in this case linking [defendant] to the murder, correct?
>
> [DETECTIVE MCNALLY]: That's correct.

[DEFENSE COUNSEL]: You didn't test the .25 caliber shell casing for fingerprints, did you?

[DETECTIVE MCNALLY]: I personally did not, no.

[DEFENSE COUNSEL]: When was the .25 caliber shell casing tested for fingerprints in this case?

[DETECTIVE MCNALLY]: It could have been before it was submitted to the lab.

[DEFENSE COUNSEL]: Do you know if it was tested?

[DETECTIVE MCNALLY]: I do not.

In response, on re-direct, the prosecutor asked the following:

[PROSECUTOR]: Detective, you were asked a series of questions about forensic evidence in this particular case specifically linking the defendant to the homicide. Do you recall those questions?

[DETECTIVE MCNALLY]: I do.

[PROSECUTOR]: In the course of your over 100 homicide investigations, what percentage involved fingerprint evidence directly linking a defendant to a homicide?

[DETECTIVE MCNALLY]: It's very rare.

[PROSECUTOR]: In your experience, how many times has DNA evidence directly linked a defendant to a homicide?

[DETECTIVE MCNALLY]: That's also very rare.

[PROSECUTOR]: You and other detectives in this case, did you look for video surveillance of this homicide?

A-2694-18

[DETECTIVE MCNALLY]: Yes.

[PROSECUTOR]: And was any located?

[DETECTIVE MCNALLY]: None was located?

[PROSECUTOR]: Is that uncommon?

[DETECTIVE MCNALLY]: Not at all.

[PROSECUTOR]: You were asked about whether or not the defendant was tested for gunshot residue. Do you recall that?

[DETECTIVE MCNALLY]: I do.

[PROSECUTOR]: How long after the homicide was the defendant arrested?

[DETECTIVE MCNALLY]: I believe two to three days.

[PROSECUTOR]: Have you ever had a case that involved gunshot residue?

[DETECTIVE MCNALLY]: I personally have not, no.

[PROSECUTOR]: You were also asked whether or not the .25 caliber shell casing recovered from the right of Shamere Melvin's body was tested for fingerprints. Do you recall that question?

[DETECTIVE MCNALLY]: I do.

[PROSECUTOR]: In your experience, have you ever had a case that involved a fingerprint being recovered from a spent shell casing?

[DETECTIVE MCNALLY]: Yes.

A-2694-18

56

[PROSECUTOR]:  How many times?

[DETECTIVE MCNALLY]:  Rare.

Defendant did not object to the re-direct testimony, and we are not convinced that the court committed error by not precluding that testimony.  Most significantly, the initial testimony on this issue was elicited on cross-examination, and Detective McNally's responses on re-direct were proper in light of the issues raised by defense counsel.  Further, the statements are rationally based on Detective McNally's perception and his first-hand experience in this homicide investigation and others, and were offered to assist the jury in understanding his testimony on cross-examination, assumedly elicited to highlight the lack of physical evidence connecting defendant to the murder.  The statements with respect to the frequency of DNA and fingerprint evidence merely clarified this point for the jury.

Finally, we find no merit to the contention that the prosecutor's comments in summation compounded any of the above alleged errors.  The prosecutor told the jury, "[d]on't forget about what Detective McNally testified about his experience with witness cooperation," and discussed Green's refusal to provide a formal statement to the police.  The prosecutor further noted that any fear Keil, Simmons, and Green may have felt about testifying was "consistent with Detective McNally's experience in homicide investigations."  Finally, the

prosecutor stated that Keil's and Simmons' testimony was "exactly what they've been saying since the moments after the murder," but the "only inconsistencies in those original statements were [Simmons] not saying that she saw the defendant pull the trigger and [Keil] not saying that she saw the defendant with a gun and that she saw him taking the marijuana."

In Walden, 370 N.J. Super. at 560, we held that a prosecutor's comments describing a witness as a "good, solid, decent, courageous [and] honest kid" and "the type of kid we hope our sons will grow up to be" were not harmless and remanded for a new trial. Those comments, the court reasoned, could be "understood to be an expression of the prosecutor's personal belief in [the witness]'s truthfulness." Walden, 370 N.J. Super. at 561. Accordingly, the court concluded that counsel improperly implied "that the jury [could] accept the witness's credibility based upon information outside the trial evidence." Ibid.

The same is not true of the prosecutor's comments here. The prosecutor did not express any personal belief in the witnesses' truthfulness or comment on the witnesses' characters. Rather, the prosecutor argued that their testimony remained consistent throughout the investigation, and properly argued that they were credible without referring to information outside the record as support. See State v. Scherzer, 301 N.J. Super. 363, 445 (App. Div. 1997) ("A prosecutor

may argue that a witness is credible but may not personally vouch for the credibility of a State witness.").

In any event, even if we were to accept that the court erred in admitting any portion of Detective McNally's testimony, defendant failed to establish that any such error was "clearly capable of producing an unjust result."  R. 2:10-2. As noted, the State presented a strong case establishing defendant's guilt based upon Simmons' and Keil's testimony that defendant shot Melvin and placed him at the scene with a gun.  In sum, we are not persuaded that any alleged error impacted the verdict.  See State v. Weaver, 219 N.J. 131, 154 (2014); see also State v. Derry, ___ N.J. ___ (2022) (slip op. at 31-32) (concluding a detective's testimony explaining the meaning of slang terms was erroneously admitted as lay, rather than expert, opinion, but holding any error was harmless given the "overwhelming evidence against defendants").

## VI.

In his fifth point, defendant maintains that even if each of the errors he argues in his first four points individually do not require reversal, the cumulative effect of the mistakes requires reversal, as they resulted in the denial of his due process rights and a fair trial.  We are not persuaded.

"[N]o matter how abhorrent the offense charged nor how seemingly evident the guilt, an accused is entitled to a fair trial," but this "does not mean

that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction." State v. Orecchio, 16 N.J. 125, 129 (1954). Moreover, it is well-settled that "[a] defendant is entitled to a fair trial but not a perfect one." State v. Marshall, 123 N.J. 1, 170 (1991) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

When multiple errors are alleged, "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007). However, even where a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014).

Given our conclusion that any trial errors were harmless, there can be no cumulative errors that could have denied defendant a fair trial. None of defendant's contentions, viewed individually or collectively, casts doubt upon the verdict. State v. Reddish, 181 N.J. 552, 615 (2004). We are satisfied that defendant received a fair trial, particularly given the various opportunities he had to object to the errors he alleges for the first time on appeal. Marshall, 123 N.J. at 170.

## VII.

In his final point, defendant contends his sentence was unconstitutionally excessive and violated the principles established by the United States Supreme Court in Miller, 567 U.S. at 471, and our Supreme Court in Zuber, 227 N.J. at 477-78. He argues that we should remand the matter for resentencing as the court inaccurately weighed the Miller factors, particularly by crediting defendant's father's testimony that he did not abuse defendant, despite a defense expert report which reached the opposite conclusion. Having considered defendant's arguments, we affirm his sentence, substantially for the reasons detailed in the sentencing court's oral decision. We add these additional comments by way of amplification.

We apply a deferential standard when reviewing a trial court's sentencing decision. State v. Grate, 220 N.J. 317, 337 (2015); State v. Fuentes, 217 N.J. 57, 70 (2014). We must affirm a sentence unless: 1) the court failed to follow the sentencing guidelines; 2) its findings of aggravating and mitigating factors were not based on competent and credible evidence in the record; or 3) "the [court's] application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." Fuentes, 217 N.J. at 70 (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). Moreover, the deferential standard of review only applies "if

the trial judge follows the Code and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014).

In Miller, 567 U.S. at 479, the United States Supreme Court held under the Eighth Amendment, except in rare instances of incorrigibility, a juvenile generally cannot be sentenced to life without the possibility of parole. The Court identified five reasons why life without parole, or its functional equivalent, unconstitutionally failed to differentiate between adults and juveniles, factors subsequently described as "the Miller factors." Zuber, 227 N.J. at 445.[6]

Our Supreme Court addressed these youthful offenders sentencing concerns in Zuber, 227 N.J. 422. It held that "Miller's command that a sentencing judge 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison' applies with equal strength to a sentence that is the practical equivalent of life without parole." Id. at 446-47 (quoting Miller, 567 U.S. at 480) (internal citations omitted). The Court explained that the "proper focus" under the Eighth Amendment is "the amount of real time a juvenile will spend in jail and not the formal label attached to his sentence." Id. at 429.

---

[6] As described in Zuber, those factors are a "defendant's 'immaturity, impetuosity, and failure to appreciate risks and consequences'; 'family and home environment'; family and peer pressures; 'inability to deal with police officers or prosecutors' or his own attorney; and 'the possibility of rehabilitation.'" Id. at 453 (quoting Miller, 567 U.S. at 477-78).

A-2694-18

In a consolidated opinion, the Court in Zuber reviewed the sentences of two offenders who were juveniles when they committed their crimes: Zuber, who was convicted of two sexual assaults and sentenced to an aggregate of 110 years with fifty-five years of parole ineligibility, and Comer, who was convicted of four armed robberies and sentenced to an aggregate of seventy-five years with just over sixty-eight years of parole ineligibility.  227 N.J. at 430-33. The Court deemed these sentences to be the functional equivalent of life without parole. Id. at 448. It declared that when a sentencing court imposes "a lengthy, aggregate sentence that amounts to life without parole" it must consider the factors set forth in Miller.  Id. at 450.

We initially address an issue not addressed by the sentencing court or the parties – whether defendant's sentence is the equivalent of life without parole. As noted, our Supreme Court recognized protections under the Federal and State Constitutions that apply to juveniles sentenced to "'life without parole' or multiple term-of-years sentences that, in all likelihood, will keep [them] in jail for the rest of [their lives]."  Zuber, 227 N.J. at 446.  Defendant's sentence does not appear to fall into the same category that requires consideration of the Miller factors.  Unlike the defendants in Zuber, who faced a minimum off fifty-five years, in one case, and more than sixty-eight years in the other, see id. at 428, 448, defendant, in contrast was sentenced to a maximum of a forty-two-year

prison term. He will be first eligible for parole when he is fifty-one years old; at most, he will be released when he is fifty-eight years old. As defendant was in any event facing a considerable minimum custodial sentence, we discern from the court's comments at the sentencing proceeding that it believed consideration of the Miller factors was appropriate and necessary in light of the "real time," see Zuber at 227 N.J. at 429, defendant will spend in jail. It is the court's findings on those factors that defendant challenges and which we accordingly address.

First, we reject any challenge to the court's findings regarding the first Miller factor and specifically any argument that the court failed to consider defendant's age and his "underdeveloped intellectual capacity." On this point, the court fully considered defendant's age by acknowledging that he was but sixteen years old when he killed Melvin, and noted that the "hallmarks" of a teenager that age are "immaturity, acting on impulse" and an inability to "appreciate risk and consequences." The court also discussed defendant's developmental issues with his mother prior to sentencing and expressly noted the opinions of defendant's neuropsychological expert, Dr. Megan Perrin, Ph.D., MPH, as stated in her report in which she concluded defendant "had an adolescent brain that was not fully developed, that he lacked maturity, [and] that he lacked understanding of the risks involved . . . ." In light of these challenges,

A-2694-18

64

and defendant's age and immaturity when he killed Melvin, the court concluded the first Miller factor weighed in defendant's favor.

The trial court also conscientiously considered the second Miller factor and noted that it was evident defendant was raised in "somewhat of a dysfunctional family through no fault of the defendant." Defendant argues that the court improperly found that his father did not abuse him, contrary to Dr. Perrin's report. The court made the aforementioned comment only after considering the testimony of defendant's father, and a letter from a pastor at the family's church, which explained that defendant and his father were active church members, and his father a role model for other children. We accordingly find no merit to defendant's challenge to the court's factual finding on this point as it was amply supported by the record. In any event, the court determined that the second factor also weighed in favor of a lesser sentence.

The court, however, weighed the third Miller factor against defendant. In doing so, the court acknowledged "defendant was placed with other peers who had anti-social behavior, and if anything, that put pressure on him." The court noted that defendant's peers "were not positive role models," he was expelled from the public school system, and had smoked marijuana since the 7th grade. Nevertheless, the court determined that defendant was not a member of a gang and did not commit the murder upon pressure from his peers.

A-2694-18

Defendant argues that this conclusion was "ill-founded," as there "was a peer with [defendant] at the time of the crime, and there was no evidence one way or the other whether this individual pressured [defendant] or not." Defendant further maintains that the court conflated gang membership with peer pressure. Contrary to defendant's contention, the court noted defendant's participation in the murder, explaining that he "planned the robbery," "carefully selected his victim," and murdered him without any outside influence. These findings are also fully supported by the record.

The court also concluded the fourth <u>Miller</u> factor militated against a reduced sentence. In doing so, the court relied on defendant's undisputed extensive involvement with the criminal justice system, which included numerous juvenile delinquencies. The trial court determined, based on his criminal history, that defendant had an ability to interact with the police and the prosecutor, along with his attorney.

Finally, the court determined that the fifth <u>Miller</u> factor, defendant's amenability to rehabilitation, should be weighed in defendant's favor. In doing so, the court noted that defendant finished high school, had completed anger management classes since he was incarcerated, and had not engaged in any physical altercations since he was detained. Based on those facts, the court concluded defendant was maturing.

In two footnotes, defendant contends first that his "arguments in the context of the Miller factors . . . apply with full force to the weighing of the aggravating and mitigating factors under N.J.S.A. 2C:44-1," and second the court should have applied new mitigating factor N.J.S.A. 2C:44-1(b)(14) retroactively as he was under twenty-six at the time of the murder. Raising substantive issues in footnotes is improper, see Rule 2:6-2(a)(6), and we could reject defendant's arguments on that procedural ground. We have nevertheless considered the arguments on the merits and reject them.

The court's consideration of aggravating factors three, six, and nine, and rejection of all mitigating factors was fully supported by the record and consistent with the law. Although defendant argued at sentencing for application of mitigating factors eight and nine, the court applied neither. Defendant does not specifically challenge the court's rejection of these factors before us, but we agree with the court that there was no support in the record for those mitigating factors.

As to mitigating factor eight, N.J.S.A. 2C:44-1(b)(8), that defendant's conduct was the result of circumstances unlikely to recur, the court noted defendant's lengthy juvenile record and twelve arrests during the period of December 2009 to May 2013, resulting in six adjudications. During that time, defendant violated probation once.

This record also supports the rejection of mitigating factor nine, N.J.S.A. 2C:44-1(b)(9), the character and attitude of the defendant indicate that he is unlikely to commit another offense. His delinquent adjudications included two thefts, burglary, criminal trespass, obtaining or selling controlled dangerous substances, and aggravated assault on a law enforcement officer. Given this history, and the escalation of defendant's crimes to murder, we are satisfied that the court did not err by rejecting application of any mitigating factor. Mitigating factor fourteen does not apply retroactively, see State v. Lane, ___ N.J. ___, ___ (2022) (slip op. at 16-17), and we note that the court considered defendant's youth, in any event.

A few final comments. Defendant's sentence will result in his incarceration for over four decades – an indisputably lengthy term. But, as the jury determined, he committed a grievous crime when he murdered Melvin in cold blood for two ounces of marijuana. We are convinced that defendant's sentence was consistent with our Code of Criminal Justice and imposed only after the court fully considered the Miller factors. On this point, we note the State recommended that the court sentence defendant to a fifty-five-year term. In rejecting the State's recommended sentence, the court specifically stated, "but for the Miller factors, [it] would [have] sentenced [defendant to] a longer time."

To the extent we have not specifically addressed any of defendant's arguments, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2694-18